## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *ARTHUR MOREAU,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *No. 1:14-cv-191-JHR* |
| | ) | |
| *CAROLYN W. COLVIN,* | ) | |
| *Acting Commissioner of Social Security,* | ) | |
| | ) | |
| *Defendant* | ) | |

### MEMORANDUM DECISION[1]

This Social Security Disability ("SSD") appeal raises the question of whether the administrative law judge supportably found the plaintiff capable of performing work existing in significant numbers in the national economy.  The plaintiff seeks remand on the bases that the administrative law judge erred in failing to apply Social Security Ruling 83-20 ("SSR 83-20") to determine the onset date of his disability and in relying on flawed jobs testimony given by a vocational expert.  *See* Plaintiff's Itemized Statement of Errors ("Statement of Errors") (ECF No. 12) at 4-21.  I find no reversible error and, accordingly, affirm the commissioner's decision.[2]

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. § 404.1520; *Goodermote v. Secretary of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the

---

[1] This action is properly brought under 42 U.S.C. § 405(g).  The commissioner has admitted that the plaintiff has exhausted his administrative remedies.  The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2), which requires the plaintiff to file an itemized statement of the specific errors upon which he seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office, and the commissioner to file a written opposition to the itemized statement.  Oral argument was held before me on March 13, 2015, pursuant to Local Rule 16.3(a)(2)(D), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.  The parties have consented to have me conduct all proceedings in this matter, including the entry of judgment. ECF No. 18.

[2] At oral argument, the plaintiff's counsel made a different argument regarding the jobs testimony than was presented in the statement of errors: that, despite indicating at hearing that she would do so, the administrative law judge failed to consider critical evidence bearing on the methodology used in the publication on which the vocational expert had relied.  However, during rebuttal, he withdrew that argument, acknowledging that it had not been timely raised.

administrative law judge found, in relevant part, that the plaintiff met the insured status requirements of the Social Security Act through March 30, 2009, Finding 1, Record at 13; that, through his date last insured, he had severe impairments of chronic pain syndrome in his upper extremities, degenerative disc disease in his cervical spine, and diminished vision in his right eye, Finding 3, *id.*; that, through his date last insured, he had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b), except for work that required the ability to climb ladders, ropes, or scaffolds, work overhead, reach, handle, and feel with the upper extremities more than frequently, perform tasks requiring binocular vision or depth perception, be exposed to hazards, or understand, remember, and carry out other than simple repetitive instructions, although he could persist to complete simple, repetitive instructions for eight hours a day, five days a week consistently, Finding 5, *id.* at 16; that, through his date last insured, considering his age (49 years old, defined as a younger individual, on his date last insured, subsequently changing to closely approaching advanced age), education (at least high school), work experience (transferability of skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that he could perform, Findings 7-10, *id.* at 22-23; and that he, therefore, had not been disabled at any time from January 1, 2009, his alleged onset date of disability, through March 30, 2009, his date last insured, Finding 11, *id.* at 24.  The Appeals Council declined to review the decision, *id.* at 1-3, making the decision the final determination of the commissioner, 20 C.F.R. § 404.981; *Dupuis v. Secretary of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence.  42 U.S.C. § 405(g); *Manso-Pizarro v. Secretary of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996).  In other words, the determination must be

supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Secretary of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The administrative law judge reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than his past relevant work.  20 C.F.R. § 404.1520(g); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Goodermote*, 690 F.2d at 7.  The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Secretary of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

## I.  Discussion

### A.  SSR 83-20

On December 8, 2010, the plaintiff filed applications for both SSD, or Title II, and Supplemental Security Income ("SSI"), or Title XVI, benefits. *See* Record at 11, 36-37.  "To be eligible to receive SSD benefits [a claimant] ha[s] to have been disabled on or before [his or] her date last insured . . .; however, eligibility for SSI benefits is not dependent on insured status." *Chute v. Apfel,* No. 98-417-P-C, 1999 WL 33117135, at *1 n. 2 (D. Me. Nov. 22, 1999).  For purposes of SSI benefits, the plaintiff was found disabled as of December 2010. *See* Record at 37.  However, the administrative law judge determined that, for purposes of SSD benefits, he was not disabled as of March 30, 2009, noting, *inter alia*, that he received no medical treatment from May 2007, after he received a workers' compensation settlement, until February 2010, when he was incarcerated. *See id*. at 14.  She stated that, based on the totality of the evidence, she "could reasonably find that the [plaintiff] was limited to medium level work on March 31, 2009[,]" but to give him "the benefit of any doubt," she would find that he was limited as assessed in her RFC

determination.  *Id*. at 22.  She explained that she was not able to credit his allegations of greater functional limitation as "the record contain[ed] no evidence whatsoever supporting greater limitations[.]"  *Id.*

The plaintiff complains that, because he was found disabled for purposes of SSI, the administrative law judge should have applied SSR 83-20 to infer his onset date of disability in adjudicating his SSD appeal.  *See* Statement of Errors at 4-16; SSR 83-20, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991, at 49 ("In addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability.  In many claims, the onset date is critical; it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits.").

SSR 83-20 provides, in relevant part:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working.  How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case.  This judgment, however, must have a legitimate medical basis.  At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.  If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.

*Id.* at 51.

The administrative law judge did not cite SSR 83-20; however, a failure to do so is harmless to the extent that the dictates of the rule are otherwise heeded.  *See, e.g., Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005) ("The ALJ did not refer to SSR 83-20 specifically in his decision, but this omission by itself is not reversible error.  We must determine whether the ALJ nevertheless properly applied the requisite analysis.  Our review of the decision leads us to conclude that he did not."); *Field v. Shalal*[a], No. CIV. 93-289-B, 1994 WL 485781, at *3 (D.N.H.

4

Aug. 30, 1994) ("The ALJ's failure to explicitly rely on SSR 83-20 does not by itself require remand. In this case, however, the ALJ's reasoning also fails to comport with SSR 83-20's substantive requirements.") (citation omitted).

While SSR 83-20 does not mandate in every instance that a medical advisor be called, or additional evidence be sought, courts have construed one or both of those steps to be essential when the record is ambiguous regarding onset date. *See, e.g., Katt v. Astrue,* No. 05-55043, 2007 W L 815418, at *1 (9th Cir. Mar. 14, 2007) ("[A]n ALJ must call a medical expert if there is ambiguity in the record regarding the onset date of a claimant's disability. If the medical evidence is not definite concerning the onset date and medical inferences need to be made, SSR 83-20 requires the administrative law judge to call upon the services of a medical advisor and to obtain all evidence which is available to make the determination.") (citation and internal quotation marks omitted); *Blea v. Barnhart,* 466 F.3d 903, 910 (10th Cir. 2006) ("[A] medical advisor need be called only if the medical evidence of onset is ambiguous.") (citation and internal quotation marks omitted); *Briscoe,* 425 F.3d at 353 ("The ALJ acknowledged that the medical evidence was inconclusive. Rather than explore other sources of evidence, as SSR 83-20 requires, the ALJ drew a negative inference at that point."); *May v. Social Sec. Admin. Comm'r,* No. 97-1367, 1997 WL 616196, at *1-*2 (1st Cir. Oct. 7, 1997) (because evidence regarding date on which claimant's mental impairment became severe was ambiguous, SSR 83-20 required administrative law judge to consult medical advisor); *Grebenick v. Chater,* 121 F.3d 1193, 1200-01 (8th Cir. 1997) ("It is important to understand that the issue of whether a medical advisor is required under SSR 83-20 does not turn on whether the ALJ could reasonably have determined that [claimant] was not disabled before September 30, 1982. Rather, when there is no contemporaneous medical documentation, we ask whether the evidence is ambiguous regarding the possibility that the onset

5

of her disability occurred before the expiration of her insured status.  If the medical evidence is ambiguous and a retroactive inference is necessary, SSR 83-20 requires the ALJ to call upon the services of a medical advisor to insure that the determination of onset is based upon a legitimate medical basis.") (citations and internal quotation marks omitted).

The plaintiff argues that the medical evidence of his onset date was ambiguous, as a result of which the administrative law judge erred in rejecting his claim for lack of contemporaneous medical evidence and failing to call a medical advisor.  *See* Statement of Errors at 5.  He separately contends that the administrative law judge erred in failing to find that, as of his date last insured, he had limitations on standing and/or walking and from headaches.  *See id*. at 13-16.  In support of both points, he cites evidence that:

1.    **Headaches**.  Following a hunting accident, he suffered from severe headaches for many years, *see id*. at 11, 14-15; *see also, e.g.,* Record at 263 (April 5, 2004, notation by psychologist Jonathan M. Borkum, Ph.D., to whom the plaintiff had been referred for cognitive-behavioral work in pain management, that the plaintiff reported that he had had "a continuous daily headache for 16 years, since having been shot by a pellet gun in a hunting accident"), 368 (March 14, 2011, report of agency examining consultant David Axelman, M.D., that the plaintiff had constant headaches since being shot in a hunting accident in 1988 and, within the prior year, had suffered from tinnitus with some vertigo and nausea), 629 (October 4, 2012, note of primary care physician Bryan Lundquist, M.D., that "we cannot seem to get [on top] of his migraines no matter what medication we have tried").

2.    **Shoulder and arm problems**.  He was injured at work in 1999 and was in ongoing treatment until 2007.  *See* Statement of Errors at 10.  As early as 2001, he was diagnosed with chronic neuropathic pain involving the ulnar distribution.  *See id*. at 11; Record at 478.  By letter

dated January 2, 2001, orthopedic specialist Vincent N. Oliviero, M.D., stated that he had "limited work capacity[,]" "may use his right arm only as a minimal aid to the left[,]" and "may not do any production line work, no pushing or pulling, squeezing with the right arm." Record at 511. Dr. Oliviero suggested, "One might try him in a program of increasing his work hours weekly, starting him probably with 4-hour days and increasing by 2 hours per day each week." *Id.* He anticipated this his restrictions would be in effect for approximately six months. *See id.* In 2002 and 2004, in connection with his workers' compensation claim, independent medical examiners assessed restrictions resulting from his shoulder and arm impairments. *See* Statement of Errors at 13; Record at 497 (December 19, 2002, assessment by Peter K. Esponnette, M.D., of restrictions including a limitation to lifting and carrying five pounds frequently, 10 pounds occasionally, and 20 pounds rarely and a need to avoid highly repetitive elbow flexion and extension), 526 (September 23, 2004, assessment by Mitchell K. Ross, M.D., of restrictions including a limitation to sedentary work with no continuous use of the left arm in a repetitive fashion, no fine movements, and no lifting greater than two pounds bilaterally). In 2005 and 2006, treating physician Raymond W. Fluke, M.D., documented ongoing complaints of neck and back pain. *See* Statement of Errors at 11-12; Record at 266-88.

On February 25, 2011, when the plaintiff reestablished treatment with Dr. Lundquist after not being seen for some time, Dr. Lundquist noted a history of shoulder pain since a work injury in 1998. *See* Statement of Errors at 12; Record at 412. The following month, Dr. Axelman, the agency examining consultant, recorded that the plaintiff's back showed pain on palpation from T4 upward with some right suprascapular muscle tightness, pain on palpation of the right shoulder, numbness in the right forearm with increased sensitivity, and increased sensitivity in the entire right hand palmar surface and dorsal surface. *See* Statement of Errors at 14; Record at 369-70.

Dr. Axelman assessed the plaintiff, in relevant part, with "constant pain" in his neck in the wake of two work injuries in 1998 and "[p]ain in the right shoulder with arthritic spurring by his history that might be amenable to arthroscopic surgery, with obvious range of motion decrease in the right worse than the left[.]" Statement of Errors at 15; Record at 370-71.  He concluded that the plaintiff would have difficulty using his right hand to handle objects, in addition to difficulty sitting, standing, and walking.  *See* Statement of Errors at 15; Record at 371.

In November 2011, Dr. Lundquist observed spasms of the trapezius muscles of both shoulders as well as the rhomboid muscles.  See Statement of Errors at 12; Record at 398.  In May 2012, he diagnosed osteoarthritis, myofascial pain syndrome, and shoulder pain for which he noted that the plaintiff was being treated by Henry Jao, M.D., and in July 2012, he diagnosed tendonitis of the rotator cuff and made referrals.  *See* Statement of Errors at 12; Record at 571, 577.  In May 2012, Dr. Jao, an orthopedic specialist, diagnosed rotator cuff tendonitis and impingement syndrome on both the left and right shoulders and scheduled an MRI of the left shoulder.  *See* Statement of Errors at 12; Record at 431.  He wrote that the plaintiff could not sit or stand for more than five minutes at a time.  *See* Statement of Errors at 12-13; Record at 430.

In August 2012, Richard J. Mazzei, M.D., diagnosed the plaintiff with left greater than right shoulder impingement and left greater than right shoulder rotator cuff pathology, but recommended against surgery.  *See* Statement of Errors at 12; Record at 621.  In November 2012, a physical therapist described the plaintiff as a person with chronic bilateral shoulder pain, worse since being in prison and being manhandled.  *See* Statement of Errors at 12; Record at 636.  She noted pain in his shoulders, weakness in his intrascapular musculature, and tingling into his hands. *See id.*

3.      **Knee problems**.  He had serious knee problems by 2007, as evidenced by a February 17, 2012, notation of Peter G. Arabadjis, M.D., of Maine Rehabilitation Outreach Center that he had reviewed an x-ray of the plaintiff's right knee dated April 27, 2007, and concluded that it showed mild to moderate arthritis of the medial joint space as well as mild patellofemoral spurring.  *See* Statement of Errors at 14; Record at 601.  In addition, problems with the plaintiff's knees were recorded during his incarceration in 2010.  *See* Statement of Errors at 15; Record at 333, 354, 356.  In February 2011, Stephen J. Barr, M.D., of Maine Ortho concluded that the plaintiff likely had a degenerative meniscus tear of the right knee and seemed to be having similar symptoms on the left recently, which could be secondary to overcompensation.  *See* Statement of Errors at 15; Record at 637.  He recommended arthroscopy if there were no improvement.  *See id.*

In March 2011, Dr. Axelman noted, *inter alia*, that the plaintiff had an absence of reflexes in both lower extremities, prepatellar swelling in both knees, a limited ability to squat, and what sounded like chondromalacia of the patella.  *See* Statement of Errors at 14; Record at 370-71.  He also observed that the plaintiff walked with a definite limp on the right.  *See* Statement of Errors at 14; Record at 370.  He concluded that the plaintiff had difficulty sitting, standing, and walking.  *See* Statement of Errors at 15; Record at 371.  In an assessment dated May 3, 2011, agency nonexamining consultant J.H. Hall, M.D., found, *inter alia*, that the plaintiff could stand for only up to four hours in an eight-hour day and lift only 10 pounds.  *See* Statement of Errors at 16; Record at 89.  In a note dated November 10, 2011, Dr. Lundquist stated that he suspected "fairly significant" osteoarthritis, following which he obtained x-rays that revealed moderately advanced degeneration of the left knee, predominantly in the medial compartment, and early degenerative changes of the femoropatellar compartment.  *See* Statement of Errors at 15-16; Record at 375, 400. In February 2012, a physical therapist found significant crepitus on palpation when flexing the

9

knees bilaterally with point tender pain around the borders of the patella.  *See* Statement of Errors at 16; Record at 426.

The plaintiff likens his case to *Oliver v. Astrue*, No. 07-157-B-W, 2008 WL 2778229 (D. Me. June 30, 2008) (rec. dec., *aff'd* July 22, 2008), *see* Statement of Errors at 9-10, in which this court held that the evidence was ambiguous, necessitating that a medical advisor be called, when a claimant had been determined to have been disabled as of March 1, 2006, for purposes of SSI benefits, was insured for SSD benefits only through September 30, 1998, "[t]here was no contemporaneous medical evidence prior to expiration of the [claimant's] insured status, and some medical evidence from examining physicians, at least one of whom was an orthopedic specialist, indicated that [he] was disabled as early as November 2001, the first point at which he had seen a physician regarding his back condition in a decade[,]" *Oliver*, 2008 WL 2778229, at *1, *7.  The court reasoned that agency nonexamining consultants who had authored opinions in 2001, 2002, and 2005 did not serve the function of medical advisors pursuant to SSR 83-20 because, having not found the claimant disabled at any point, they did not address the question of the onset date of his disability.  *See id*. at *7.

At oral argument, the plaintiff's counsel contended that in this case, as in *Oliver*, the reports of agency nonexamining consultants "only add to a tapestry of conflicting evidence, rather than resolve (or preclude a finding of) any ambiguity."  *Id*. at *6.  He asserted that, from 2002 to 2007, at least five physicians had suggested that the plaintiff had a progressive condition that was disabling or the functional equivalent, citing *Loza v. Apfel*, 219 F.3d 378 (5th Cir. 2000), for the proposition that "once evidence has been presented which supports a finding that a given condition exists it is presumed in the absence of proof to the contrary that the condition has remained unchanged[,]" *Loza*, 219 F.3d at 395-96 (citations and internal punctuation omitted).

10

The plaintiff adds that the asserted errors in failing to assess additional limitations were not harmless in that he was within two months of his 50th birthday as of his date last insured, and if the higher age category had been applied, any combination of a reduction in lifting to only 10 pounds or a reduction in walking and/or standing to only four hours per day would have resulted in a favorable SSD disability finding.  *See* Statement of Errors at 16.

However, as the commissioner rejoins, *see* Defendant's Opposition to Plaintiff's Itemized Statement of Specific Errors ("Opposition") (ECF No. 15) at 3-5, *Oliver* is materially distinguishable.  In this case, Dr. Hall prepared two RFC opinions dated May 3, 2011, one addressing the plaintiff's then-current functioning, which formed the basis for the grant of SSI benefits, and one addressing the plaintiff's functioning through his date last insured.  *See* Record at 87-91.  On reconsideration, a second agency nonexamining consultant, Donald Trumbull, M.D., rendered an opinion solely for the period through the date last insured, the plaintiff's application for SSI benefits having been granted.  *See id.* at 102-04.  Both consultants, extrapolating from evidence predating and postdating the plaintiff's date last insured, found that he did not have disabling limitations as of that date although he was currently disabled.  *See id.* at 84-85, 87-91, 98, 102-04.  It is, thus, fair to say that both consultants considered the question of the onset date of disability.[3]

In turn, the administrative law judge relied in part on those opinions, determining that later-submitted evidence was cumulative of the evidence reviewed by Drs. Hall and Trumbull and that, although she reasonably could have found the plaintiff capable of medium-level work as of his

---

[3] Moreover, as counsel for the commissioner contended at oral argument, it is unclear how a medical advisor called at hearing would have been in a better position than Drs. Trumbull and Hall to assess whether the plaintiff became disabled prior to his date last insured.  While the advisor would have had the benefit of review of medical records postdating the Trumbull and Hall opinions, those materials are even more remote from the plaintiff's date last insured and presumably of even less significance than the records Drs. Trumbull and Hall did review.

date last insured, she gave him the benefit of the doubt by assessing a more restricted work capacity. *See id.* at 21-22.

As the commissioner points out, *see* Opposition at 5, this court has held that state agency consultants' notations that they had insufficient evidence to assess a claimant's condition prior to his date last insured "cut against, rather than supporting, a finding of ambiguity[,]" *McGlynn v. Astrue*, No. 1:11-cv-395-DBH, 2012 WL 2913535, at *5 (D. Me. June 28, 2012) (rec. dec., *aff'd* July 17, 2012). Drs. Hall's and Trumbull's affirmative findings that the plaintiff did not have disabling limitations prior to his date last insured cut even more strongly against a finding of ambiguity.[4]

Beyond this, as the commissioner contends, *see* Opposition at 6-12, the plaintiff falls short of demonstrating, on the basis of his citation to specific medical records, that the administrative law judge erred in failing to call a medical advisor pursuant to SSR 83-20 or assess additional restrictions. In effect, the administrative law judge identified "proof to the contrary" that conditions the plaintiff contends were disabling prior to 2007 were in fact disabling, or "remained unchanged." *Loza*, 219 F.3d at 395-96 (citations and internal quotation marks omitted):

1.    **Headaches**. The administrative law judge noted, *see* Record at 14, and the plaintiff does not contest, that headaches were not mentioned after 2006 until 2010. Although she concluded that there was no evidence that the plaintiff had headaches as of his date last insured, she found, consistent with the Hall and Trumbull opinions, that even if he then had them, they did not cause more than a slight limitation in his ability to perform basic work tasks. *See id.* at 14,

---

[4] The plaintiff argues, in passing, that the administrative law judge exceeded her competence as a layperson by impermissibly translating raw medical data into functional terms. *See* Statement of Errors at 7. Because she explained that she gave the plaintiff the benefit of the doubt by finding him more functionally restricted than supported by the evidence, including the Hall and Trumbull opinions, any error was harmless.

105-06.  Moreover, the plaintiff told Dr. Borkum on April 5, 2004, that his longstanding headaches "did not prevent him from functioning, indeed succeeding."  *Id*. at 263.  While he complained of worsening headaches in January 2006, *see id*. at 283, by July 2006, he described them as "not too bad at the moment[,]" *id*. at 272.  In February 2011, when he reestablished care with Dr. Lundquist, he reported that he was followed for chronic pain at that office "until he realized that he could replace his medications with a 'healthy amount' of marijuana" and "ended up selling 'a couple of pounds a week,'" which "landed him in Federal prison" until his release in December 2010.  *Id*. at 412.  He told Dr. Lundquist that his headaches were treated in prison with Propranolol and nonsteroidal anti-inflammatory drugs, which "worked fine for the most part[.]"  *Id*.  Subsequent notes indicate that the plaintiff's headaches responded to treatment until August 2012, *see id*. at 390, 393, 404, 581-82, 620, worsening to the point that he was sent for neurological consultation in October 2012, well after the expiration of his date last insured, *see id*. at 629.  To the extent that the plaintiff relies on the Axelman report, the administrative law judge declined to credit it insofar as it differed from her RFC determination because it was given more than two years after the plaintiff's date last insured, without any indication that Dr. Axelman intended to assess the plaintiff's condition as of that time.  *See id*. at 22.  The plaintiff does not separately challenge the weight given to the Axelman opinion, *see generally* Statement of Errors, and, in any event, this was a reasonable basis on which to discredit it.

       2.    **Shoulder and arm problems**.  The administrative law judge acknowledged that, prior to plaintiff's date last insured, he had severe impairments of chronic pain syndrome in his upper extremities and degenerative disc disease in his cervical spine, *see* Finding 3, Record at 13, for which he was treated with morphine sulfate and Baclofen, *see id*. at 18.  However, she inferred that by 2007, his pain had improved with time and medication, given indications in Dr. Arabadjis's

notes that he had increased his activity, had less pain, and had decreased his use of medication, including morphine. *See id.*; *see also, e.g., id.* at 304 (plaintiff noted on September 21, 2006, to have gone fishing, carried a canoe, albeit with increased pain for several days, run a wood splitter, and taken short rides on four-wheeler with his wife), 300 (plaintiff noted on February 1, 2007, to have settled his workers' compensation case, to be using settlement in part to build a new house, and to be driving up to three hours a day to obtain supplies for builders, although having paresthesias in his right hand while driving), 296 (plaintiff noted on May 31, 2007, not to be taking all of his prescribed morphine). The plaintiff was then "lost to followup" for a period of time. *See id.* at 600.

The administrative law judge noted that, after the plaintiff resumed treatment in 2010 while incarcerated, treatment notes from that period contained no indication that his upper body symptoms were not well-controlled with medication or caused any functional limitations. *See id.* at 19. On February 17, 2012, Dr. Arabadjis noted that Baclofen had been effective in reducing the plaintiff's myofascial pain during the earlier period, and that prior to his incarceration, the plaintiff had reduced his weight to 190 pounds, worked as a Maine guide, and played his drums regularly. *See id.* at 600, 602. The plaintiff acknowledges that, as he relayed to his physical therapist in November 2012, his upper extremity impairments worsened during his incarceration in 2010, nearly a year after his date last insured. *See* Statement of Errors at 12; Record at 635.

To the extent that the plaintiff relies on Dr. Jao's May 30, 2012, notation that he could not sit or stand for more than five minutes at a time, *see* Record at 430, this appears to have been a reflection of the plaintiff's own subjective allegations, having been noted in the "Social History" portion of his progress note of May 30, 2012, *see id.* Indeed, Dr. Jao had opined, in February 2012, that the plaintiff could lift 100 or more pounds occasionally and 50 pounds frequently and

stand/walk for about six hours per day, and that his ability to sit was not affected.  *See id*. at 419-20.  To the extent that the plaintiff relies on the Axelman opinion, the administrative law judge supportably discredited it for the reasons discussed above.  Finally, as the administrative law judge observed, *see id*. at 22, the 2002 opinion of Dr. Esponnette and the 2004 opinion of Dr. Ross were rendered several years prior to the plaintiff's date last insured and prior to the period in 2006 and 2007 when the evidence indicates his arm and shoulder condition improved.

3.     **Knee problems**.  While the administrative law judge acknowledged that treatment notes indicated that the plaintiff experienced knee pain while incarcerated, she stated that there was no mention of a lower extremity impairment prior to his date last insured.  *See id.* at 19.  As noted above, in his statement of errors, the plaintiff contested this observation, relying on a February 17, 2012, note in which Dr. Arabadjis indicated that he had reviewed x-rays of the plaintiff's right knee dated April 27, 2007, which revealed mild to moderate arthritis of the medial joint space as well mild patellofemoral spurring.  *See* Statement of Errors at 14; Record at 601. However, at oral argument, the plaintiff's counsel did not dispute the commissioner's observation that Dr. Arabadjis apparently meant to refer to x-rays taken on April 27, 2011, given that there is no such x-ray of record from 2007 and that Dr. Arabadjis seemingly described the findings made in the 2011 x-ray report.  *See* Opposition at 11; *compare* Record at 373 *with id*. at 601.  In any event, even if the x-ray dated from 2007, it does not, standing alone, substantiate serious knee problems prior to the plaintiff's date last insured, particularly in light of the assessment of Drs. Hall and Trumbull that the plaintiff's allegations of knee impairment were better supported by 2011 imaging demonstrating osteoarthritic changes to the knee and his morbid obesity.  *See* Record at 87, 101.  In addition, Dr. Jao noted on November 30, 2011, that the plaintiff's knee problem had been exacerbated in recent years due to weight gain.  *See id*. at 386.  To the extent that the plaintiff

relies on the Axelman opinion, the administrative law judge supportably discredited it for the reasons discussed above.  To the extent that he relies on Dr. Hall's May 2011 assessment of his then-current functioning, that opinion is inapposite, Dr. Hall having rendered a separate opinion regarding the plaintiff's condition through his date last insured.  *Compare id*. at 87-89 *with id*. at 89-91.

For all of these reasons, the plaintiff fails to demonstrate that the medical evidence was ambiguous regarding his onset date of disability, requiring that the administrative law judge call a medical advisor, or that she otherwise erred in failing to assess additional limitations on standing and/or walking or as a result of his headaches.

## B.  Vocational Testimony

The plaintiff next contends that the administrative law judge erred in relying on vocational expert testimony at Step 5 because the expert identified jobs that a person with the posited restrictions seemingly could not do and gave invalid testimony as to the numbers of those jobs. *See* Statement of Errors at 16-21.  I find no reversible error.[5]

### 1.  Identification of Jobs

At hearing, the vocational expert testified that a hypothetical individual who, among other things, required "jobs that could be performed with only monocular vision, in other words they would need to avoid jobs requiring depth perception and binocular vision[,]" could perform the jobs of school bus monitor, Dictionary of Occupational Titles (U.S. Dep't of Labor, 4th ed. rev. 1991) ("DOT") § 372.667-042, mail clerk, DOT § 209.687-026, and parking lot attendant, DOT § 915.473-010.  *See* Record at 64.  He affirmed that, except for differences as to which he had

---

[5] The plaintiff also argues that the vocational expert testimony was invalid because premised on a flawed RFC determination.  *See* Statement of Errors at 18.  My rejection of the plaintiff's separate challenge to the RFC determination is dispositive of this point.

testified, his testimony was consistent with information contained in the DOT. *See id.* at 65. However, he subsequently conceded on cross-examination by the plaintiff's counsel that the job of parking lot attendant was unsuitable, in that the DOT indicated that frequent depth perception was required. *See id.* at 66-67. The administrative law judge nonetheless relied on all three jobs in finding the plaintiff not disabled prior to his date last insured. *See id.* at 23. She stated that she had determined that the vocational expert's testimony was consistent with the DOT. *See id.*

The plaintiff contends that, in violation of Social Security Ruling 00-4p ("SSR 00-4p"), the administrative law judge erred in relying on the parking lot attendant and school bus monitor jobs, both of which the DOT indicates require depth perception, without resolving the conflict between the vocational expert's testimony and the DOT. *See* Statement of Errors at 17; SSR 00-4p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2014), at 246 (adjudicator must inquire whether vocational expert's evidence conflicts with information in the DOT and, if there is an apparent conflict, obtain a reasonable explanation and resolve the conflict before relying on the vocational expert's evidence). He adds that because the administrative law judge used a term not defined in the DOT, "binocular vision," and the vocational expert was wrong about two jobs, there is no reason to assume that he was correct that the remaining job of mail clerk does not require binocular vision. *See* Statement of Errors at 17.

The commissioner concedes that reliance upon the job of parking lot attendant was misplaced. *See* Opposition at 13. However, she suggests that the plaintiff waived his argument regarding the school bus monitor job by failing to raise that point with the vocational expert at hearing. *See id.* She argues, in the alternative, that even if the school bus monitor job is also eliminated, the Step 5 decision stands because the administrative law judge properly relied on the mail clerk job. *See id.* at 13-14; *see also, e.g., Dana v. Astrue*, Civil No. 09-514-BW, 2010 WL

17

3397465, at *3 (D. Me. Aug. 24, 2010) (rec. dec., *aff'd* Sept. 13, 2010) ("This court has routinely held that a single job available in significant numbers in the national economy is sufficient to meet the commissioner's burden at Step 5.").

I agree with the commissioner that remand is not warranted because the plaintiff falls short of demonstrating that reliance on the mail clerk job was misplaced. The administrative law judge asked the vocational expert to identify any conflict between his testimony and the DOT, he identified none regarding a need for binocular vision and the mail clerk job, and the plaintiff's counsel failed to inquire about any such conflict. *See* Record at 64-69. In these circumstances, "a claimant waives a claim of failure to identify and resolve a conflict between vocational expert testimony and the DOT unless he or she can show that the conflicts were obvious enough that the ALJ should have picked up on them without any assistance." *Welch v. Astrue*, No. 1:11-cv-384-GZS, 2012 WL 3113148, at *7 (D. Me. July 11, 2012) (rec. dec., *aff'd* July 31, 2012) (citation and internal punctuation omitted). *See also, e.g., Baker v. Social Sec. Admin. Comm'r*, Civ. 1:10-cv-00167-JAW, 2011 WL 1298694, at *5 (D. Me. Mar. 31, 2011) (rec. dec., *aff'd* Apr. 19, 2011) ("There is an expectation that counsel will explore these concerns with the vocational expert at the hearing, not leave such matters to technical challenges before the courts.").

The plaintiff does not make this showing. The DOT indicates that, while the job of mail clerk requires near acuity, it does not require far acuity, depth perception, color vision, or field of vision. *See* DOT § 209.687-026. In addition, as the commissioner observes, this court has previously found no conflict between a need to avoid tasks requiring good binocular vision and the demands of the job of cashier II, DOT § 211.462-010, which, like the mail clerk job, does not require climbing, far acuity, or depth perception or entail exposure to moving mechanical parts or high exposed places. *See Edwards v. Colvin*, No. 2:13-cv-419-JHR, 2015 WL 46071, at *2 (D.

Me. Jan. 2, 2015); *compare* DOT § 209.687-026 *with id*. § 211.462-010.  There is no "apparent conflict."

### 2.  Job Numbers

The plaintiff finally seeks reversal and remand on the basis that the vocational expert's testimony regarding job numbers was unreliable.  *See* Statement of Errors at 17-21.  He points out that the vocational expert acknowledged that his numbers were derived from a private publication called the Occupational Employment Quarterly II ("OEQ II").  *See id*. at 18; Record at 69.  He contends that the OEQ II numbers reflect aggregate numbers for entire Standard Occupational Classification ("SOC") code groups, which do not correspond to the specific occupations about which the vocational expert testified and contain jobs with differing skill and exertional levels.  *See* Statement of Errors at 19.  He adds that the OEQ II's methodology is "patently unreliable" because, to arrive at numbers for individual DOT-coded jobs, it merely divides the aggregate number of jobs in the SOC group by the number of DOT-coded jobs.  *See id*. at 19-20.

He notes that, while the vocational expert testified that he thought these were good numbers, he admitted that he had done nothing to confirm their validity.  *See id*. at 19.  He analogizes this case to *Clark v. Astrue* ("*Clark I*"), Civil No. 09-390-P-H (D. Me. July 19, 2010) (rec. dec., *aff'd* Aug. 9, 2010), and *St. Pierre v. Astrue*, No. 1:10-cv-104-JAW (D. Me. Dec. 29, 2010) (rec. dec., *aff'd* Jan. 19, 2011), in which this court reversed and remanded when vocational experts essentially admitted that they had given numbers that pertained not to the specific DOT-coded jobs at issue but rather to groups of jobs of differing skill and exertional levels that happened to contain the three specific jobs.  *See id*. at 20-21.  He also cites *McDonald v. Barnhart*, No. 05-69-B-W, 2005 WL 3263937, at *4 (D. Me. Nov. 30, 2005) (rec. dec., *aff'd* Dec. 20, 2005), for the

proposition that "sufficiently murky" vocational evidence as to numbers of available jobs warrants remand. *See id*. at 20.

As the commissioner rejoins*, see* Opposition at 16-17, this court has rebuffed similar challenges to vocational testimony on numbers of jobs when a vocational expert has relied not only on raw numbers from the OEQ or SOC but also on his or her professional expertise, *see, e.g., Small v. Colvin*, No. 1:12-cv-236-GZS, 2013 WL 1912892, at *7-*8 (D. Me. Mar. 30, 2013) (rec. dec., *aff'd* May 8, 2013); *Woodard v. Astrue*, No. 1:10-cv-327-DBH, 2011 WL 2580641, at *5 (D. Me. June 28, 2011) (rec. dec., *aff'd* July 19, 2011); *Decker v. Astrue*, Civil No. 09-641-P-S, 2010 WL 4412142, at *2-*3 (D. Me. Oct. 31, 2010) (rec. dec., *aff'd* Nov. 18, 2010).  In *Small*, reliance on such vocational evidence was deemed permissible even when the vocational expert admitted that he did not know the OEQ's methodology and that simply dividing the SOC codes by the number of DOT-coded jobs would not be a valid measure of job incidence.  *See Small*, 2013 WL 1912892, at *8.  The court explained that "the use of the OEQ data allowed the vocational expert to offer numbers for DOT-specific jobs, curing the problem identified in *Clark I* and *St. Pierre*[,]" and that, "despite his testimony that the methodology at issue would be invalid, the vocational expert endorsed the particular numbers that he supplied in this case."  *Id*.

Similarly, while in this case, the vocational expert testified that he had done no independent research into the validity of the OEQ II methodology, *see* Record at 77, he stated that he deemed the OEQ II a "tried and true source" that provided "the best numbers" for this purpose and, "[b]ased on [his] experience their numbers appear to be reasonable[,]" *id*. at 70.

In addition, as the commissioner points out, *see* Opposition at 17-18, in rebuffing a similar challenge to the use of OEQ data in a case in which a vocational expert described it as "the best data that's available[,]" this court observed, "[t]o hold otherwise, under the circumstances of this

case, would compel a vocational expert to undertake personally a study of the labor market for every specific job he or she might testify is available for a particular claimant, an unnecessarily extensive and expensive requirement to impose upon the defendant[,]" *Clark v. Astrue* ("*Clark II*"), No. 2:11-cv-373-DBH, 2012 WL 2913700, at *4 (D. Me. June 28, 2012) (rec. dec., *aff'd* July 17, 2012) (footnote omitted).

Because the testimony at issue falls on the *Small*/*Woodard*/*Decker*/*Clark II* side of the jobs-numbers dividing line, the administrative law judge did not err in relying upon it.[6]

## II.  Conclusion

For the foregoing reasons, the commissioner's decision is **AFFIRMED**.

Dated this 14th day of April, 2015.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[6] The plaintiff's citation to *McDonald*, in which vocational testimony was deemed "sufficiently murky" to warrant reversal and remand, is equally unavailing. Whereas, in *McDonald*, the vocational expert stated that the number of available jobs would be reduced for a person with the claimant's transferable skills without quantifying how, *see McDonald*, 2005 WL 3263937, at *4, in this case the vocational expert supplied approximate numbers for each job, including a number of about 70,000 nationally for mail clerks, *see* Record at 64.